**PPV INTERNATIONAL SPORTS LICENSE AGREEMENT**

EFILED Document
CO Douglas County District Court 18th JD
Filing Date: Mar 16 2007 10:56AM MDT
Filing ID: 14151379
Review Clerk: Joleen K Jenkins

This PPV International Sports License Agreement (this "Agreement") is entered into as of this 20th day of January, 2005 (the "Effective Date"), by and between EchoStar Satellite L.L.C., a Colorado limited liability company (hereinafter referred to as "EchoStar") having a place of business at 9601 South Meridian Blvd., Englewood, Colorado 80112, and JVC Entertainment, Inc. a New York corporation (hereinafter referred to as ("Licensor") having a place of business at 41 Midland Avenue, Port Chester, New York 10573.

**INTRODUCTION**

WHEREAS, EchoStar is engaged, among other things, in the business of providing digital video and audio services via DISH Network™.

WHEREAS, Licensor holds the exclusive rights to the Events set forth in Section 1(A) below for the Licensed Territory (as defined in Section 1(D) below), and desires to convey such rights to EchoStar for the dates and times set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and promises hereinafter set forth and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, EchoStar and Licensor hereby agree as follows:

**AGREEMENT**

**1. <u>GENERAL TERMS</u>.**

**A. Events:** **LIVE Soccer:** ***VIII Central American Sports Games***

The following is representative of the tentative dates and times for each match comprising the Events (but not the total number of matches) and EchoStar agrees that such dates and times may be changed prior to the first match actually played. Notwithstanding the foregoing, Licensor shall provide EchoStar with a definitive schedule of dates and times for each match comprising the Events not later than ninety (90) days before the first match is to be played.

| GAME | DATE | TIME | TEAMS |
|---|---|---|---|
| 1 | Nov-24-2005 | 12:00 Noon (EST) | TBD |
| 2 | Nov-24-2005 | 6:00 PM (EST) | TBD |
| 3 | Nov-24-2005 | 8:00 PM (EST) | TBD |
| 4 | Nov-26-2005 | 9:00 AM (EST) | TBD |
| 5 | Nov-26-2005 | 12:00 Noon (EST) | TBD |
| 6 | Nov-26-2005 | 6:00 PM (EST) | TBD |
| 7 | Nov-28-2005 | 12:00 Noon (EST) | TBD |
| 8 | Nov-28-2005 | 6:00 PM (EST) | TBD |
| 9 | Nov-28-2005 | 8:00 PM (EST) | TBD |
| 10 | Nov-30-2005 | 6:00 PM (EST) | TBD |
| 11 | Nov-30-2005 | 8:00 PM (EST) | TBD |
| 12 | Dec-2-2005 | 6:00 PM (EST) | TBD |
| 13 | Dec-2-2005 | 8:00 PM (EST) | TBD |
| 14 | Dec-4-2005 | 6:00 PM (EST) | TBD |
| 15 | Dec-4-2005 | 8:00 PM (EST) | TBD |

In addition, Licensor expressly agrees that the teams participating in the Events will be the National Teams of the following countries: Belize, El Salvador, Honduras, Nicaragua, Costa Rica, Guatemala and Panama.



EXHIBIT
A

**B. Distribution Rights:** The exclusive right to broadcast the Events, via all forms of distribution technology (i.e. all forms of media now known or hereinafter devised including without limitation broadband and wireless technologies) on a live and/or delayed basis, to DISH Network Subscribers for residential and/or commercial reception in the Licensed Territory during the Licensed Period (as that term is defined below) (the "Broadcast Rights"). For purposes of this Agreement, the term "Subscriber" shall mean an individual or entity who subscribes (in good standing) to one or more services on the EchoStar DBS System for use in: (i) a Residential Location; or (ii) a Commercial Establishment (as defined below). Notwithstanding the foregoing, the following shall not be considered "Subscribers" for the purposes of paying any fees due hereunder (a) EchoStar and/or any of Affiliates' test sites; (b) EchoStar's and/or any of its Affiliates' retailer showrooms; and (c) employees of EchoStar and/or any of its Affiliates. For purposes of this Agreement, the term "Residential Location shall mean shall mean a single-family home or other fixed residential dwelling of any kind (i.e. apartment, town home, duplex, condo, assisted living facility, etc.), an oil rig, offshore drilling platform, military barracks, dormitory or other similar structure; and the term "Commercial Establishment" shall mean a private office, bar, tavern, restaurant or similar establishment of public accommodation and viewing.

**C. Licensed Period:** The Licensed Period for each individual Event shall commence contemporaneously with the live play of each such Event and shall expire ninety-six (96) hours after completion of each such Event (including the live broadcast and unlimited encore (repeat) transmissions or replays during such period of time).

**D. Licensed Territory:** The District of Columbia, the fifty (50) United States of America and its territories, possessions, commonwealths and trusteeships (including but not limited to Puerto Rico and the U.S. Virgin Islands).

**E. Licensed Language:** All Languages.

**F. Format:** The Events shall be provided with commentary and Match graphics in English and Spanish and shall include a national (international) sound mix. EchoStar reserves the right to dub the Events into any and all other languages, at its sole discretion, for broadcast in the Licensed Territory.

**G. Licensor Delivery Method:** Licensor shall transmit to EchoStar a high-quality signal for the Events in accordance with U.S. industry standards for general entertainment (the "Signal") via fiber or from a satellite commonly used for the transmission of television programming and which is receivable by EchoStar's uplink facility designated below as the Delivery Point (as that term is defined below), at all times during the Term and shall keep EchoStar apprised of both the satellite and transponder it is using for such transmission. Licensor shall, at its sole cost and expense, fully encode and scramble the Signal of the Events, utilizing technology, standards, practices and procedures which are generally accepted throughout the U.S. cable television and DBS industry. Licensor shall provide EchoStar with a primary and backup integrated receiver decoder(s) ("IRD(s)") and, if necessary, an antenna, in order that EchoStar may receive the Signal of the Events at the Delivery Point from the Licensor's satellite.

**H. Delivery Point:** EchoStar's uplink and transmission facility in Cheyenne, Wyoming (U.S.A.) or such other facility as EchoStar may designate in writing including without limitation, the Gilbert, Arizona facility.

2. <u>**GRANT OF RIGHTS**</u>.

2.1 Licensor hereby grants to EchoStar, and any Affiliate of EchoStar, the exclusive license and right (but not the obligation except as otherwise expressly set forth herein), inclusive of all intellectual property rights of any kind associated with such grant, to: (i) receive and decrypt the Events; (ii) copy the Events for the purpose of replaying them; (iii) distribute, sub-distribute, perform and display the Events through the exercise of the Broadcast Rights; (iv) advertise, promote, publicize, market and exhibit the Events; and (v) utilize all or any portion of the Events along with the trade name, trademarks, service marks, logos and other identifying information associated therewith for purposes of advertising, marketing and promoting the Events or other similar programming. For purposes of this Agreement, the term "Affiliate" shall mean any person or company that directly or indirectly or through one or more intermediaries, controls or is controlled by, or is under common control with a party to this Agreement; and for the purposes of this definition, the term "Control" (including the words controlling or controlled by) shall mean the power to direct or cause the direction of the management and policies of a person or entity whether through the ownership of voting securities, by contract or otherwise. Licensor shall provide all documentation necessary for EchoStar to perfect the rights granted to it hereunder and shall provide commercially reasonable assistance with the enforcement of such rights in the Licensed Territory.

2.2 In the event that any single match comprising the Events is cancelled or postponed for any reason whatsoever, including without limitation due to a Force Majeure (as defined in Section 9.10 below) event or an interruption in the Signal, EchoStar shall have the right to terminate this Agreement and shall not have any liability whatsoever directly or indirectly to Licensor and EchoStar will not be required to pay Licensor any License Fees for such match(es). Additionally, Licensor shall immediately return a pro rata portion of the License Fee paid by EchoStar in advance (if any) for each such cancelled or postponed match.

2.3 Licensor shall not grant any rights granted to EchoStar herein to any third party within the Licensed Territory during the Licensed Period. In the event the Events are distributed using a technology for which EchoStar has the exclusive right in accordance with Section 2.1 of this Agreement, Licensor shall forfeit and EchoStar shall be relieved of its obligation to pay to Licensor the License Fee otherwise payable hereunder.

2.4 In the event that Licensor obtains the rights to distribute the 2009 Central American Sports Games (the "2009 Games") in the Territory, Licensor shall offer to EchoStar (in an offer that complies with Section 9.5 of this Agreement), the exclusive right to distribute such 2009 Games in the Territory on materially the same terms and conditions set forth in this Agreement and EchoStar shall have a period of sixty (60) days to accept such offer. If EchoStar does not accept such offer, Licensor may offer the 2009 Games to other video programming distributors in the Territory, provided that if Licensor offers the 2009 Games to such other video programming distributor(s) on terms which are materially more favorable to such other distributor(s) than the terms contained herein, then before entering into a definitive agreement with such other distributor(s), Licensor will first re-offer the 2009 Games to EchoStar on such more favorable terms and EchoStar shall have a period of thirty (30) days to accept such offer.

3. **<u>LICENSE FEE</u>.**

3.1 <u>Amount</u>. As full and complete compensation for the rights granted to EchoStar by Licensor hereunder, EchoStar shall pay to Licensor Two Hundred Fifty Thousand U.S. Dollars (U.S. $250,000.00) (the "License Fee").

3.1.1 EchoStar shall collect any and all fees due from Event Subscribers hereunder and Licensor shall not have the right to do so. Should Licensor receive any such fees directly from any Subscriber(s), it shall promptly forward all such fees to EchoStar.

3.2 Payment. EchoStar shall pay the License Fee by check payable to the order of Licensor and delivered to Licensor at the address set forth in this Agreement as follows: (i) 10% (US $25,000.00) within twenty (20) business days of execution of this Agreement by all parties; (ii) 40% (US $100,000.00) on or before February 28, 2005; and (iii) the remaining 50% (US $125,000.00) forty-five (45) days following the final Event.

3.3. Responsibility for Taxes/Fees. Licensor shall be solely responsible for and shall pay all taxes, fees, assessments, levies or charges, howsoever denominated, whether imposed by any governmental authority, athletic commission or other similar body that are directly or indirectly related to the display and/or exhibition of the Events including, without limitation, ticket taxes, promoter taxes, gross receipts, income, sales, use and property taxes, licenses or any other such fees related to the Events and/or the exhibition thereof.

3.3.1 Licensor agrees and acknowledges that it is responsible for and shall pay all taxes, assessments, levies, charges or fees, howsoever denominated, imposed by any governmental authority, athletic commission or other similar body on, or related to, the exhibition of the Events, including, without limitation, ticket taxes, promoter taxes, gross receipts, sales, use, and property taxes, licenses or other fees howsoever denominated and that if any such charges or fees are assessed against EchoStar, EchoStar may deduct such amounts from payments otherwise due to Licensor (including payments associated with event other than the Events). Licensor further acknowledges and agrees that if its is not a US domiciled entity, Echostar will withhold, from all payments owed to Licensor hereunder, United States withholding taxes at the highest applicable rate under US Tax regulations unless EchoStar has received from Licensor proof, satisfactory to EchoStar in its sole discretion, that payment to Network is exempt from withholding taxes as documented on a US Treasury Form W-9 or W-8 BEN. As an alternative, EchoStar will withhold at a reduced treaty rate if EchoStar determines, in its sole discretion, that it has sufficient proof that Licensor is a resident of a country which has a reduced treaty rate with the United States (the treaty rate is to be documented on a United States Form W-8BEN).

3.3.2 EchoStar shall be responsible for any State or Federal sales and income tax liability assessed to it in connection with its distribution of the Events hereunder.

## 4. DELIVERY OF SIGNAL; MARKETING; AD AVAILS.

4.1 Costs. Licensor shall be solely responsible for all costs of production and delivery of the Events to the Delivery Point. Licensor shall deliver to the Delivery Point a primary and secondary feed of a live (no taped delay)/taped broadcast quality video and audio Signal of the Events in its/their entirety in NTSC format to international broadcast standard (the "Telecast"). It is expressly agreed that the Telecast shall be provided with commentary and match graphics in English and Spanish. EchoStar reserves the right to dub the Events into all other Licensed Languages for broadcast in the Territory. The failure of Licensor to timely deliver the Events to the Delivery Point in the form specified herein shall constitute a material breach by Licensor of this Agreement, shall entitle EchoStar, in its sole discretion, to terminate this Agreement and shall relieve EchoStar of any payment obligation to Licensor hereunder.

4.1.1 Licensor shall be solely responsible for the delivery of a broadcast quality video and audio depiction of the telecast of the Event in its entirety (the "Telecast") to EchoStar's transmission and uplink center in Cheyenne, Wyoming or such other facility as EchoStar may designate in writing (the "EchoStar Uplink Facility") on the dates and prior to the times set forth herein. Such depiction shall be in a form reasonably acceptable to EchoStar, enabling it to properly deliver the Event to the Event Subscribers at all times in accordance with industry standard technical specifications. The

failure of Licensor to timely deliver the Telecast to the EchoStar Uplink Facility in an acceptable form and within the requisite time periods shall constitute a material breach by Licensor of this Agreement. EchoStar may make a copy of the Event for the purpose of replaying the Event in accordance with Section 1(C) hereof.

4.2 Spillover. EchoStar's satellite broadcast of the Events is intended to be distributed only within the Licensed Territory, however Licensor understands that the Signal will spill over outside and beyond such geographic boundaries. Licensor's delivery of the Events Signal is intended to be received and exploited by EchoStar only in the Licensed Territory, however EchoStar understands that the Signal will spill over outside and beyond such geographic boundaries. The Parties expressly agree that any such spillover, in and of itself, shall not constitute a breach of this Agreement.

4.3 Program/Event Cancellation/Postponement/Technical Difficulty. Licensor shall immediately notify EchoStar's uplink facility and Pay-Per-View department if a cancellation, postponement or technical difficulty occurs during or prior to the exhibition of all or any part of the Events and, within 72 hours thereof, provide EchoStar with a written report detailing the cause of and all other relevant information concerning such cancellation, postponement or technical difficulty.

4.4 Advertisements. EchoStar shall have the right but not the obligation to supply two (2) field billboards or banners depicting EchoStar trademarks and logos for on-field display during each Event hereunder in each of the (3) three stadiums where the Events will be played. In addition, EchoStar shall have the right but not the obligation to insert commercial advertisements or cross-channel promotional spots ("interstitials") over the Events during half-time, stoppages in play and other similar intervals. EchoStar shall have the right, in its sole discretion, to exploit such interstitial slots for itself, or to sell some or all of such interstitial slots to third parties. In the event that EchoStar sells any interstitial slots to a third party, EchoStar shall be entitled to retain 100% of the revenues attributable thereto. EchoStar shall also have the right, but not the obligation, to insert a graphic bug or DISH Network logo on-screen during match play so long as such bug or logo does not diminish the viewing area visible to Event Subscribers.

5. **REPRESENTATIONS, WARRANTIES AND COVENANTS.** The representations, warranties and covenants in this Article 5 shall survive the termination or earlier expiration of this Agreement for any reason whatsoever into perpetuity.

5.1 Mutual. Each party represents and warrants to the other that (i) it is duly organized, validly existing and in good standing under the laws of the State or Country under which it is organized, (ii) it has the power and authority to enter into this Agreement and to perform fully its obligations hereunder; (iii) it is under no contractual or other legal obligation that shall in any way interfere with its full, prompt and complete performance hereunder; (iv) the obligations created by this Agreement, insofar as they purport to be binding on it, constitute legal, valid and binding obligations enforceable in accordance with their terms.

5.2 By Licensor. Licensor represents, warrants and covenants to EchoStar that:

5.2.1 it presently has and will continue to have at all times during the Term of all rights necessary to grant EchoStar the rights contracted for by EchoStar under this Agreement, including without limitation the rights granted in Section 2.1 of this Agreement.

5.2.2 it presently has and will continue to have at all times during the Term all rights necessary to grant EchoStar the right to use Licensor's trademarks, service marks, logos and related trade usage as permitted hereunder;

5.2.3 it presently is and will remain at all times during the Term in full compliance with all applicable laws, codes, rules and regulations, including without limitation all such statutes, laws, rules, regulations and orders enforced, administered, promulgated or pronounced in the Territory and in the country or countries in which the content for the Program(s)/Events originate(s);

5.2.4 no programming included as part of the Events will be defamatory, libelous, slanderous or obscene nor will it contain any material which violates or infringes any copyright, right of privacy or literary or dramatic right of any person or entity;

5.2.5 it will pay as and when due any and all copyright, royalty or other performance rights payments through to the viewer, including without limitation payments to ASCAP, BMI, SESAC and any other applicable music performance society or other applicable entity with respect to all performance rights programming included as part of the Program(s)/Events;

5.2.6 the Events shall not appear on any free over-the-air or pay or basic cable or satellite television (i.e. non EchoStar Pay-Per-View programming/packaging) in the Territory, on a live or delayed basis, for at least ninety-six (96) hours following the premier broadcast of the Events;

5.2.7 the Telecast shall not contain any advertisements for, or otherwise mention, any distributor of programming services, including without limitation Pay-Per-View services, that are not owned and/or operated by EchoStar or its affiliates and subsidiaries;

5.2.8 the Telecast shall not contain any advertisements for future Events to be broadcast via cable or satellite television unless Licensor has first obtained EchoStar's prior written consent;

5.2.9 no third party has, or to the best knowledge of Licensor has claimed any rights which would be inconsistent with the rights granted to EchoStar hereunder.

As a condition subsequent to the effectiveness of any obligation on the part of EchoStar under this Agreement, Licensor shall deliver or cause to be delivered to EchoStar certified copies of all documents (together with certified translations of documents not in the English language) deemed by EchoStar to be necessary to fully and completely evidence Licensor's acquisition of all rights necessary to effect Licensor's grant of rights to EchoStar hereunder.

**6. <u>CONFIDENTIALITY</u>.** The provisions of this Article 6, shall survive expiration or termination of this Agreement indefinitely.

6.1 Each Party represents, warrants and covenants to the other that it will keep strictly confidential; (1) the terms of this Agreement, (2) all information and data relating in any way to any persons or entities who subscribe to EchoStar programming ("Confidential Information"). Confidential Information shall not be disclosed to any third party, and the release access to or use of such Confidential Information shall be restricted to those employees, officers or representatives of Licensor who have a need to know such

information. Licensor's obligations under this Article 6 shall survive the expiration or earlier termination of this Agreement. Licensor acknowledges and agrees that any and all subscribers who subscribe to any EchoStar programming including, without limitation, the Events shall be deemed customers of EchoStar for all purposes and EchoStar shall have absolutely no obligation whatsoever to (and nothing herein shall require EchoStar to) disclose the names, addresses, profiles or other identifying information of such subscribers ("Subscriber Information") to Licensor or anybody acting on Licensor's behalf.

7. **INDEMNIFICATION**. The provisions of this Article 7, shall survive expiration or termination of this Agreement indefinitely.

7.1 Licensor shall indemnify and hold EchoStar, its Affiliates, directors, officers, members, employees and agents of EchoStar (collectively, the "EchoStar Indemnitees") harmless from, against and with respect to any and all claims, damages, liabilities, costs and expenses (including reasonable attorney fees) incurred in connection with any claim against any of the EchoStar Indemnitees arising out of: (i) the breach or default of any of Licensor's representations, warranties, covenants, obligations or duties herein; (ii) the content of the Events (including, without limitation, advertising spots, direct on-air sales programming and music performance rights), including, without limitation, any claims alleging that content of the Events is defamatory, libelous, slanderous or obscene, or violates or infringes any copyright, right of privacy or literary, dramatic or music performance right of any person or entity; (iii) the sale or marketing of any products or services by, through or on the Events; (iv) Licensor's advertising and marketing of the Events; (v) Licensor's use of any logos, trademarks, service marks, trade names or other identifying information of EchoStar inconsistent with EchoStar's instructions; and (vi) any interruptions in the transmission of the Events to EchoStar.

7.2 EchoStar shall indemnify and hold harmless each of Licensor, its Affiliates, directors, officers, employees and agents of Licensor, (collectively, the "Licensor Indemnitees") from, against and with respect to any and all claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees) incurred in connection with any claim against the Licensor Indemnitees arising out of: (i) the breach or default of any of EchoStar's representations, warranties, covenants, obligations or duties hereunder; and (ii) EchoStar's advertising insertions and its marketing of the Events (unless the relevant materials are provided by Licensor).

7.3 A party claiming indemnification under this Article 7 shall promptly notifying the other party in writing of any claim or action for which indemnification is sought (a "Claim"). The indemnifying party shall undertake the defense of any Claim and permit the indemnified party to participate therein at the indemnified party's expense. The indemnified party, at the indemnifying party's cost, will cooperate fully in the defense of the Claim. The settlement of any Claim, in whole or in part, by an indemnified party, without the indemnifying party's prior written consent, shall release the indemnifying party from its obligations hereunder with respect to that portion of the Claim so settled. It is expressly agreed that neither Party may settle or otherwise dispose of any Claim against or adverse to the other Party without the prior written approval and consent of such Party, which consent shall not be unreasonably withheld, conditioned or delayed.

8. **TERM AND TERMINATION.**

8.1 This Agreement shall commence on the date first written above and shall expire at the end of the Licensed Period unless earlier terminated in accordance with the provisions of this Agreement (the "Term").

8.2 In addition to any other rights it may have under this Agreement, at law or in equity, EchoStar may terminate this Agreement by sending written notice to Licensor should any of the following occur: (i) Licensor is in material breach of any representation, warranty, covenant or obligation in this Agreement and such breach (if capable of being cured) has not been cured within thirty (30) days of EchoStar's notice thereof; (ii) Licensor becomes insolvent, or voluntary or involuntary bankruptcy, insolvency or similar proceedings are instituted against Licensor; (iii) the content of the Program(s)/Events fails to comply with any U.S. (local, state or federal) or international laws, rules or regulations, including without limitation such statutes, laws, rules, regulations and orders enforced, administered, promulgated or pronounced by the United States Federal Communications Commission; or (iv) an interruption in the transmission of the Signal of a Events.

9. **MISCELLANEOUS.**

9.1 Waiver; Remedies Cumulative. The failure of either party at any time to enforce any right or remedy available to it under this Agreement or otherwise with respect to any breach or failure by the other party shall not be construed to be a waiver of such right or remedy with respect to any other breach or failure by the other party. All rights and remedies reserved to either party shall be cumulative and shall not be in limitation of any other right or remedy which such party may have at law or in equity.

9.2 Limitation of Liability. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY EXEMPLARY, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES. IN NO EVENT SHALL ANY PROJECTIONS OR FORECASTS BY EITHER PARTY BE BINDING AS COMMITMENTS OR PROMISES. IN NO EVENT SHALL THE AGGREGATE LIABILITY OF ECHOSTAR AND ITS AFFILIATES IN CONNECTION WITH THIS AGREEMENT EXCEED THE NET REVENUES FROM THE LICENSE FEES ACTUALLY PAID BY ECHOSTAR.

9.3 Attorney Fees. In the event of any suit or action to enforce or interpret this Agreement or any provision thereof, the prevailing party shall be entitled to recover its costs, expenses and reasonable attorney fees, both at trial and on appeal, in addition to all other sums allowed by law.

9.4 Successor Interests; Assignment. This Agreement is binding upon the heirs, legal representatives, successors and assigns of EchoStar and Licensor. Neither party may assign or otherwise transfer any of its rights or obligations under this Agreement without the prior express written consent of the other party to this Agreement, except that EchoStar may assign this Agreement in whole or in part to an Affiliate at any time without the consent of Licensor. In furtherance and without limitation of the foregoing, in the event that any person or entity who, as of the date first written above, did not possess, directly or indirectly, the power to direct or cause the direction of management or policies of Licensor, whether by virtue of the ownership of voting stock, by contract or otherwise, later comes into possession of such power, that will be considered an assignment requiring EchoStar's consent hereunder. Notwithstanding anything to the contrary in the foregoing, Licensor may not make any assignment of its rights or obligations under this Agreement to a competitor of EchoStar in the multichannel video programming distribution business, or a provider of programming services to EchoStar without prior written consent of EchoStar. Any assignment or other transfer prohibited herein shall be null and void.

9.5 Notices. All notices to be given pursuant to this Agreement ("Notice") shall be in writing, signed by the party issuing them, and sent by: (i) facsimile transmission; (ii) first class certified mail, postage prepaid; or (iii) overnight courier service, charges prepaid, to the party to be notified, addressed to such party at the following address, or sent by facsimile to the following fax number, or such other address or fax number as such party may have substituted by notice given to the others in accordance with this Section. The sending of such notice with confirmation or receipt thereof (in the case of facsimile

transmission) or receipt of such notice (in the case of delivery by certified mail or by overnight courier service) shall constitute the giving thereof:

| | |
|---|---|
| If to Licensor: | JVC Entertainment, Inc.<br>41 Midland Ave.<br>Port Chester, NY 10573<br>Attn: Nicanor Cordova , Marketing Director<br>Fax No: (914) 934-0937 |
| with a copy to: | Propp, Lubell & Lapidus, LLP<br>Time Square Plaza<br>1500 Broadway, 21st Floor<br>New York, NY 10036<br>Attn: David G. Lubell |
| If to EchoStar: | EchoStar Satellite L.L.C.<br>9601 South Meridian Blvd.<br>Englewood, Colorado 80112<br>Attn: Susan Arnold, Vice President of Programming<br>Fax No.: (303) 723-1999 |
| with a copy to: | Attn: General Counsel<br>Fax No.: (303) 723-1699 |

9.6 Governing Law and Exclusive Jurisdiction. This Agreement shall be construed by and governed in accordance with the laws of the State of Colorado, without regard to its choice of law provisions. The federal and state courts located in the State of Colorado shall have exclusive jurisdiction to hear and determine any claims, disputes, actions or suits which may arise under or out of this Agreement. The parties voluntarily consent to the personal jurisdiction of, and waive any objection as to venue in, such courts for such purposes.

9.7 Severability. The parties agree that each provision of this Agreement shall be construed as separable and divisible from every other provision and that the enforceability of any one provision shall not limit the enforceability, in whole or in part, of any other provision hereof. The invalidation or unenforceability of any of the provision contained in this Agreement shall in no way affect any of the other provisions hereof or the application thereof and the same shall remain in full force and effect. In the event that a court of competent jurisdiction determines that any term or provision herein, or the application thereof to any person, entity, or circumstance, shall to any extent be invalid or unenforceable, it shall be construed by limiting and reducing it so as to be enforceable under then applicable law.

9.8 Entire Agreement, Construction, Effectiveness, and Modification. This Agreement contains the entire understanding of the parties with respect to the subject matter hereof, and supersedes any and all prior or contemporaneous agreements, representations or undertakings between the parties with respect to the subject matter hereof, including any prior license agreement entered into between the parties or their predecessors in interest. The captions used herein are for reference purposes only and shall not be used in the interpretation of this Agreement. This Agreement has been fully reviewed and negotiated by the parties hereto and their respective counsel. Accordingly, in interpreting this Agreement, no weight shall be placed upon which party hereto or its counsel drafted the provision being interpreted. This Agreement will not become effective, binding or valid in any manner whatsoever, in whole or in part, until signed by

EchoStar. No waiver, modification or amendment of any of the terms or conditions of this Agreement shall be effective unless memorialized in a writing that has been signed by both Parties hereto.

9.9 Compliance with Law. The parties shall comply with, and agree that this Agreement is subject to, all applicable federal, state and local laws, rules and regulations, including, without limitation, all of the provisions of the Communications Act of 1934 and all amendments thereto, now enacted or hereafter promulgated in force during the Term.

9.10 Force Majeure. Notwithstanding anything to the contrary in this Agreement, neither party shall be liable to the other for failure to fulfill its obligations hereunder if such failure is caused by or arises out of an act of Force Majeure including acts of God, war, terrorism, strike, riot, labor dispute, natural disaster, technical failure beyond the reasonable control of either Party (including without limitation the failure of all or part of: (1) any satellite which is directly or indirectly owned, operated or utilized for transmission by EchoStar or any of its Affiliates; (2) transponders on which the Events are delivered to EchoStar by Licensor, or by EchoStar to Event Subscribers; or (3) any uplinking or other equipment related to the satellites and/or transponders described in subsections (1) and (2) above), governmental order or regulation or any other reason beyond the reasonable control of the party whose performance is prevented during the period of such occurrence (each an event of "Force Majeure"). The Term shall be suspended during the period when a party is unable to fulfill its obligations hereunder by reason of such occurrence. In addition, the License Fee payable by EchoStar shall be reduced on a pro-rated basis if, by reason of force majeure, an Event Subscriber receives less than the entire Event(s) and the programming service charge to such Event Subscriber is reduced accordingly.

9.11 Relationship of the Parties. The relationship of the parties hereto is that of independent contractors. Nothing contained herein shall be deemed to create, and the parties hereto do not intend to create, any relationship of employee/employer, partnership, joint venture or agency, nor shall any similar relationship be deemed to exist between them.

9.12 Counterparts. This Agreement may be executed via facsimile and in one or more identical counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.

IN WITNESS HEREOF, each of the parties hereto has duly executed and accepted this Agreement as of the day and year first above written.

| | |
|---|---|
| **ECHOSTAR SATELLITE L.L.C.** | **JVC ENTERTAINMENT, INC.** |
| By: ______________________ | By: ______________________ |
| Susan Arnold, Vice President | Julio Vanegas, Executive Director |

PROPP LUBELL & LAPIDUS, LLP
TIMES SQUARE PLAZA
1600 BROADWAY, 21ST FLOOR
NEW YORK, NEW YORK 10036

TEL (212) 986-7714
FAX (212) 687-0056
WWW.PROPPLUBELL.COM

DAVID G. LUBELL

OF COUNSEL
EMAIL: DLUBELL@PROPPLUBELL.COM

OF COUNSEL
THEODORE PROPP

EFILED Document
CO Douglas County District Court 18th JD
Filing Date: Mar 16 2007 10:56AM MDT
Filing ID: 14151379
Review Clerk: Joleen K Jenkins

January 11, 2005

**<u>Via Telecopier: 303.723.1699</u>**

EchoStar Satellite L.L.C.
9601 South Meridian Blvd.
Englewood, Colorado 80112

Attention: General Counsel

**Re: <u>Proposed PPV International Sports License Agreement Between EchoStar</u>**

Dear Sir or Madame:

At the request of my client, Julio Vanegas of JVC Entertainment, Inc., the following are JVC's comments to the above referenced Licence Agreement.:

1. The name of the game should be "*VIII Central American Sports Games* Live Soccer Event."

2. Prior to the list of the games, add: The actual time and date of the soccer matches shall be set by the sporting commission no less than five (5) months prior to the games. The following list is an example of how the games shall be scheduled out and consist of.

3. Paragraph 2.1(v) - The seventh line provides that any portion of the event or any identifying information could be used not only with respect to promoting the events but "other similar programming". This is not appropriate and should be deleted. The right to marketing, advertising and promoting should be limited to the Event. The material should be solely to the events covered by the agreement and not to similar programming.

4. Paragraph 2.2, provides that if the event is cancelled or postponed for any reason the licensor (JVC) shall return any portion of the license fee that had been paid by EchoStar in advance. I think this provision should be revised, so as not to provide for such return

EXHIBIT
B

in the situation where the event is cancelled or postponed by EchoStar. Likewise, it should not be applicable to all events of force majeure as defined in section 9.1.0.

5. Paragraph 2.4 provides that if the licensor obtained the rights to the 2009 games it would offer EchoStar the exclusive rights to distribute under the same terms and conditions set forth in this agreement. This is not an acceptable provision. It should provide that Echo be given first option to negotiate such exclusive rights in good faith and in no event less than the terms and conditions in the present agreement.

6. Paragraph 3.2 the remaining fifty percent referred to should be one hundred and twenty five thousand dollars, not one hundred and fifty thousand dollars.

7. Paragraph 3.3.1 should make it clear that no taxes, assessments, levies, charges etc, resulting from Echo's broadcast shall be the responsibility of payment by licensor. Such taxes etc must be the responsibility of EchoStar, not licensor.

8. Paragraph 3.4 should be deleted since it only refers to a nonexclusive license and this is an exclusive license.

9. Paragraph 4.1.1 the last sentence should be deleted since the rights to EchoStar to replay the event beyond the license period is not a right given to Echo in the agreement.

10. Paragraph 4.2 should provide that Echo that uses its best reasonable efforts to prevent and stop any such spill over.

11. Paragraph 4.4.1 obligates licensor, JVC, at its own cost and expense to advertise, publicize and promote EchoStar broadcast of the events. This was not part of the understanding that JVC had and is not part of the obligations that it is willing to undertake. The cost and expense of promoting the broadcast of the events are the expenses of the broadcaster and not the licensor. This paragraph should be deleted.

12. Paragraph 4.4.2 and 4.4.3 should be deleted. These are obligations, responsibilities and expenses of EchoStar and not of the licensor. These all relate to marketing the EchoStar broadcast and EchoStar's cost of business.

13. Paragraph 4.5 should be reworded as follows: "<u>Advertisements</u>. EchoStar at its own cost and expense shall have the right but not the obligation to supply two (2) field billboards depicting EchoStar trademark and logos for on-field display during each Event hereunder on each of the three stadiums in which the games are to be played in."

13. Paragraph 5.3 should have reciprocal representation from EchoStar to Licensor. This particularly is appropriate with respect to paragraphs 5.2.1, 5.2.3, 5.2.4 with respect to the broadcasting of the events.

PROPP LUBELL & LAPIDUS, LLP



14. Paragraph 5.2.9 - The confidentiality provision in 6.1 should be reciprocal in so far as any of the information relating to the terms of the agreement and the business of the licensor etc.

15. Paragraph 7.3 the last sentence should also be reciprocal with respect to EchoStar selling or disposing of any claim which would be adverse to licensor without the prior written approval and consent of licensor.

16. Paragraph 8.2 should make clear the application of local and State laws would only apply if they are not superceded or preempted by U.S. law.

17. Paragraph 9.2 in the first sentence of the laws "EchoStar or any affiliate of EchoStar be liable" should be deleted and replaced with "any party be liable to the other party". The last sentence of 9.2 should be deleted as well.

18. Paragraph 9.5- A right to notice should be added after "to licensor" to:
Propp, Lubell & Lapidus, LLP
Time Square Plaza
1500 Broadway, 21st Floor
New York, NY 10036.
Attn: David G. Lubell

24. Paragraph 9.6 the last two sentences of 9.6 should be deleted. The licensor has a New York address and can served at its office in New York. There is not need for an agent to accept service of processes. In addition as a New York corporation the Secretary of State, in the absence of the corporate person, will accept the service. The last sentence is not acceptable.

25. At the end of Paragraph 9.8 add the following "and by licensor."

26. Paragraph 9.10- Starting on the forth line with the words "technical failure" through the parentheses on the eighth line after the words "Force Majeure" should be deleted. These items are not items of Force Majeure but are technical failures that are part of Echo's business and are under the control of a party and not an "act of god".

Warm regards.

Very truly yours,

David G. Lubell

cc: JVC Entertainment Inc., via telecopier